UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

In Re

ROBERT C. GODBOLD,                          Case No. 04-16678-MAM

    Debtors.

BANK OF PINE HILL

    Plaintiff,

v.                                            Adv. No. 05-1038

ROBERT C. GODBOLD

    Defendant.

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Richard D. Shinbaum, Montgomery, Alabama, Attorney for Debtor
William D. Azar and Von G. Memory, Montgomery, Alabama, Attorneys for Plaintiff

This matter is before the court on competing motions for summary judgment regarding the Bank of Pine Hill's complaint to determine dischargeability. The court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of Reference of the District Court. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and the court has the authority to enter a final order. For the reasons indicated below, the court is granting in part and denying in part the defendant's motion for summary judgment and denying the plaintiff's motion for summary judgment.

## FACTS

Robert Godbold, the defendant, and the Bank of Pine Hill, the plaintiff, have had a business relationship for many years. During the course of this banking relationship, the Bank of Pine Hill lent money to Godbold on a number of occasions. To receive these loans, the Bank of Pine Hill required Godbold to periodically provide a current financial statement. The Bank of Pine Hill also ran periodic credit reports on Godbold. The financial statement Godbold was required to fill out contained the following paragraph:

> For the purpose of procuring credit from time to time I/we furnish the foregoing as a true and accurate statement of my/our financial condition. Authorization is hereby given to the Lender to verify in any manner it deems appropriate any and all items indicated on this statement. The undersigned also agrees to notify the Lender immediately in writing of any significant adverse change in such financial condition.

Godbold also had a banking relationship with Camden National Bank. On April 7, 2000 Camden National Bank lent Godbold $160,000 to purchase 160 acres of land in Wilcox County, Alabama. To secure this $160,000 loan, Godbold gave Camden National Bank a $160,000 mortgage on the 160 acres he purchased. On or about June 7, 2000 Godbold sold two separate portions of the acreage and paid down the mortgage on the land to approximately $48,416. By February 2, 2002, Godbold had paid the mortgage down to approximately $46,420. On September 16, 2002, Camden National Bank, upon Godbold's request, advanced an additional $12,500 to Godbold against the mortgage, bringing the mortgage balance on that date to approximately $58,070.

Although Godbold had a full-time job at a local paper mill, in December of 2001, he borrowed money from the Bank of Pine Hill to purchase equipment for a small business he was

starting called R&M Dozer, LLC. Godbold operated R&M Dozer on a part-time basis, while continuing to work at the paper mill full-time. R&M Dozer was not as successful as Godbold had anticipated and by 2003 Godbold was barely able to make the interest payments on his loans to Bank of Pine Hill.

Although Godbold and his family owned a house on Heather Lane in Pine Hill, Alabama, he and his wife decided to build a new home on the land they had purchased. On October 6, 2003 Camden National Bank gave Godbold a $75,000 construction loan/line of credit, based on a take-out agreement from First Mortgage of Alabama, Inc., so that Godbold could build a new house on his land. The construction loan was secured by the April 7, 2000 mortgage on the land, pursuant to the future advance clause in the mortgage. Godbold testified that he had a buyer lined up to purchase his house on Heather Lane, so he did not believe the new home mortgage would adversely affect his financial situation.

On October 10, 2003 Godbold went to the Bank of Pine Hill seeking to renew three separate loans. Godbold did not disclose to the Bank of Pine Hill that he had been given the $75,000 line of credit by Camden National Bank four days earlier. Without any knowledge of the construction loan, the Bank of Pine Hill renewed Godbold's three original loans combining them into two renewal loans. On October 16, 2003, Godbold submitted a financial statement to Bank of Pine Hill. As of that date, Godbold had not drawn any of the $75,000 line of credit available to him through the home construction loan with Camden National Bank and thus Godbold did not list the available credit on the October 16, 2003 financial statement he gave to the Bank of Pine Hill. The Bank of Pine Hill ran a credit report on Godbold on October 17, 2003 and the line of credit did not appear. On October 24, 2003 went back to the Bank of Pine Hill

-3-

seeking a new loan of $2,264.20 to purchase a hay baler. The Bank of Pine Hill gave Godbold the new loan, evidenced by a note and secured by a purchase money security interest in the new hay baler and all Godbold's other equipment, then owned and after acquired.

In mid to late October, Godbold began drawing money from the construction loan and began construction on his new house. In November 2003, after construction on the new house had begun, the buyer Godbold had "lined up" to purchase his house on Heather Lane backed out of the sale. From December 18, 2003 to May 18, 2004, Godbold requested the Bank of Pine Hill renew six of his loans, one of which was a $108,000 loan secured by a John Deere bulldozer. Godbold did not inform the Bank of Pine Hill about the construction loan, his new home construction, or the anticipated sale of his current home falling through when he sought these renewals. Each time the Bank of Pine Hill renewed the loans without running any additional credit checks on Godbold.

On March 30, 2004 Camden National Bank increased Godbold's construction line of credit based on a new updated take-out agreement from First Mortgage of Alabama, bringing the line of credit to $115,000. On June 18, 2004 Godbold went back to the Bank of Pine Hill seeking to have a $2,441.28 unsecured loan renewed. Before agreeing to the renewal, the Bank of Pine Hill ran a new credit report on Godbold. The credit report showed that Godbold had a $115,000 line of credit with Camden National Bank and that Godbold owed approximately $82,000 on that loan. With knowledge of the construction loan, the Bank of Pine Hill renewed the $2,441.28 unsecured note. On August 24, 2004, Godbold returned to the Bank of Pine Hill seeking to renew a $2,807.42 unsecured note. The Bank of Pine Hill, with knowledge of the construction loan, agreed to the renewal.

On November 13, 2004 Camden National Bank renewed Godbold's two loans that were tied to the original mortgage (the $115,000 construction loan and the $58,070 loan) and combined them into a single loan for $171,979 including accrued interest and fees.[1] This single loan was still secured by the original mortgage on the land. On November 17, 2004 Godbold filed his petition in bankruptcy.

The Bank of Pine Hill filed this adversary proceeding seeking to have the loan debts owed to it by Godbold declared nondischargeable under § 523(a)(2)(A) & (B). The parties agree that the financial statement given by Godbold on October 16, 2003 was technically true. Although Godbold did not list the construction loan he had recently been given by Camden National Bank, because he had not drawn any money from the line of credit, he did not owe any money on it on the date the financial statement was given. Therefore, the information disclosed was not false. However, the Bank argues Godbold had a duty to disclose the line of credit when he got it, based on the clause in the previous financial statements, and that the omission of such information misled the Bank about Godbold's financial condition. Furthermore, the Bank argues that the nondisclosure on the October 16, 2003 financial statement was a materially false statement in writing on which the Bank relied to its detriment. Thus the Bank argues Godbold's loan debts to it should not be discharged because Godbold's omission created a false impression of his true financial condition. The Bank asserts that if Godbold had informed them of the

---

[1] First Alabama Mortgage had agreed to do the permanent financing on Godbold's new home, and had supplied Camden National Bank with two take-out agreements in anticipation of doing so. However, for reasons unknown to the court, First Alabama Mortgage backed out. This left Godbold without any permanent financing on the home and left Camden National Bank without anyone to take-out the mortgage. After some negotiations (which may have included negotiations between Godbold and the Bank of Pine Hill as well), Camden National Bank agreed to permanently finance Godbold's new home.

construction loan it would not have loaned him additional money or renewed the various outstanding loans after October 6, 2003, particularly the $108,000 loan on the John Deere bulldozer, but rather it would have called in Godbold's loans with the Bank. By contrast, Godbold argues the financial statement was true and correct when he gave it, and that he did not intend to deceive the Bank at any time. Therefore, Godbold argues, the Bank's complaint cannot prevail and the loans should be discharged.

Attached to the Bank's motion for summary judgment was an affidavit of Leonard William Godbold, president of the Bank. In his affidavit, William Godbold swears, under oath, that if the Bank had known the truth about the construction loan and Godbold's increased debt, it would not have made any new loans or renewed any loans after the construction loan was given to Godbold.

In response to the Bank's motion, Godbold provided an affidavit swearing, under oath, that the Bank had full knowledge of the construction loan at least as early as June 18, 2004, when it ran a new credit report on Godbold which showed the $115,000 line of credit with Camden National Bank with Godbold owing a balance of $82,000. After that time, with knowledge of Godbold's increased debt, the Bank renewed two of Godbold's loans. Godbold further stated in his affidavit that he went to the Bank in late September or early October 2004, concerning a mortgage on his new house, and that William Godbold, with full knowledge of Godbold's financial situation, offered to make a mortgage loan on the new house. Godbold stated, that pursuant to that mortgage offer, the Bank ordered an appraisal done on the new home, and that upon conclusion of the appraisal process, the Bank offered to make the permanent loan on the house, on the condition that Godbold mortgage all his remaining acreage. Godbold stated he

-6-

eventually got permanent financing on the house from Camden National Bank, but that the Bank, with actual knowledge of his debt to Camden National Bank, did not call any of his loans in, but offered to loan him more money to permanently finance the house in exchange for the mortgage on the house and all the land.

After the court heard the parties' summary judgment arguments and took the matters under advisement, the Bank filed an amendment to their motion for summary judgment. Attached to the amendment was a second affidavit of William Godbold. In William Godbold's second affidavit, he swore under oath, that he did not have full knowledge of Godbold's financial situation, he never offered to make a mortgage on Godbold's new house, he was not aware Godbold had a new house, and that the Bank did not order an appraisal on the house. William Godbold goes on to state that the Bank learned of Godbold's increased debt to Camden National Bank after pulling Godbold's credit report on June 18, 2004, and talked with Godbold concerning this increased debt. William Godbold stated the only reason the Bank did not call the loans at that time was because Godbold made ongoing statements/representations to him that the Bank was going to get paid off on the John Deere bulldozer loan by the equipment dealer.

Godbold responded to the Bank's amendment, pointing out that William Godbold's second affidavit presented a significant change from the Bank's previous position. Previously the Bank alleged that it had no knowledge of Godbold's increased debt and if it would have known, the Bank would not have loaned any additional money or renewed any loans and would have called in Godbold's outstanding loans. Now the Bank admits it knew of the increased debt, at least as early as June 18, 2004, and did in fact renew two loans with this knowledge and did not call any loans. Furthermore, William Godbold's second affidavit stated that the Bank did not

order an appraisal on the new house, nor did he know a new house existed. However, Godbold submitted into evidence, an appraisal on the house, dated October 19, 2004, bearing the Bank's name as the appraiser's client.

LAW

Motions for summary judgment are controlled by Rule 56 of the Federal Rules of Civil Procedure, which has been made applicable to bankruptcy proceedings pursuant to Fed. R. Bankr. P. 7056. A court shall grant summary judgment to a party when the movant shows that "there is no genuine issue as to any material fact . . . the moving party is entitled to judgment as a matter of law." Fed. R. Bankr. P. 7056(c). In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), the Supreme Court found that a judge's function is not to determine the truth of the matter asserted or weight of the evidence presented, but to determine whether or not the factual disputes raise genuine issues for trial. *Anderson*, at 2510, 2511. All inferences are resolved in favor of the party defending against each motion. *Comer v. City of Palm Bay, Fla.*, 265 F.3d 1186 (11th Cir. 2001); *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 177 F.3d 1278, 1285 (11th Cir. 1997).

In the instant case, the plaintiff, Bank of Pine Hill, has filed a complaint seeking to have the debts owed to it excepted from discharge under 11 U.S.C. §§ 523(a)(2)(A) and (B). Section 523 states, in pertinent part:

> (a) A discharge under section 727 . . . of this title does not discharge an individual
>     debtor from any debt–
> . . . .
>  (2) for money, property, services, or an extension, renewal, or refinancing of
> credit, to the extent obtained by –
>    (A) false pretenses, a false representation, or actual fraud, other than a
> statement respecting the debtor's or an insider's financial condition;

  (B) use of a statement in writing–
   (i) that is materially false;
   (ii) respecting the debtor's or an insider's financial condition;
   (iii) on which the creditor to whom the debtor is liable for such money,
    property, services, or credit reasonably relied; and
   (iv) that the debtor caused to be made or published with intent to deceive;
. . . .

11 U.S.C. § 523(a)(2)(A) and (B).

§ 523(a)(2)(B)

Under § 523(a)(2)(B), a debt is nondischargeable in bankruptcy where it was obtained by a writing: (1) that is materially false; (2) respecting the debtor's or insider's financial condition; (3) on which the creditor to whom the debt is liable for such money, property, services, or credit reasonably relied; and (4) that the debtor caused to be made or published with the intent to deceive. 11 U.S.C. § 523(a)(2)(B). The Bank, as the objecting creditor, has the burden of proving each of these elements by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279 (1991). If any of these elements is not met, the debt is dischargeable. *Id.* Moreover, courts generally construe the statutory exceptions to discharge in bankruptcy liberally in favor of the debtor, recognizing that the reasons for denying a discharge must be real and substantial, not merely technical and conjectural. *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 304 (11th Cir. 1994). This narrow construction ensures that the "honest but unfortunate debtor" is afforded a fresh start. *Birmingham Trust National Bank v. Case*, 775 F.2d 1474, 1477 (11th Cir. 1985).

The parties agree that there existed a statement in writing concerning the debtor's financial condition. The issues remaining are whether a material misrepresentation occurred, whether Godbold had the intent to deceive when he made the financial statement, and whether the Bank reasonably relied on the financial statement. The Bank acknowledges that the financial

statement submitted by Godbold on October 16, 2003 was technically true. Although Godbold had been given a $75,000 construction loan to build a new house, at the time he made the financial statement, he had not withdrawn any of the money and thus did not technically owe any of that money yet. However, the bank argues, by not disclosing the existence of the line of credit, that he had already been given and on which he knew he would soon be owing, he misrepresented his financial condition. Godbold argues that on October 16, 2003, when he gave the financial statement, it was true and correct.

Numerous courts have considered and attempted to determine the meaning of the phrase "materially false." *First Interstate Bank of Nevada v. Greene (In re Greene)*, 96 B.R. 279, 282-83 (9th Cir. B.A.P. 1989). Although no precise definition exists, it is clear that material falsity in a financial statement can be premised upon the inclusion of false information or upon the omission of information about a debtor's financial condition. *Id.*; *Armstrong Rubber Co. v. Anzman (In re Anzman)*, 73 B.R. 156, 163 (Bankr. D. Colo. 1986). "A financial statement can be literally true within the four corners of the document but still be materially false if it is a material misrepresentation of the debtor's financial condition." *First National Bank of Elgin v. Nilles (In re Nilles)*, 35 B.R. 409, 411 (N.D. Ill. 1983). Courts have found a materially false statement to be one which "paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit." *Borg Warner Central Environmental Systems, Inc. v. Nance (In re Nance)*, 70 B.R. 318, 321 (Bankr. N.D. Tex. 1987) (quoting *Merchants National Bank v. Denenberg (In re Denenberg)*, 37 B.R. 267, 271 (Bankr. D. Mass. 1983)); *Riggs National Bank of Washington, D.C. v. Ross (In re Ross)*, 180 B.R. 121, 127 (Bankr. E.D. Va. 1994). Materiality should be

judged by the debtor's actual financial condition compared to the picture the debtor paints of it. *Id.* Given Godbold's current income and debt-to-income ratio, as he reported them on the October 16, 2003 financial statement, and the size of the construction loan he did not report, the court finds the omission of the construction loan to be a material omission. The information contained in Godbold's financial statement, although technically true, painted a substantially untruthful picture of his financial condition. The ability of Godbold to draw from the line of credit had already been approved and such information is of the kind that would normally effect the decision to extend credit. Therefore, the court finds the October 16, 2003 financial statement to be materially false.

The remaining two issues, then, are whether Godbold gave the October 16, 2003 financial statement with the intent to deceive and whether the Bank reasonably relied on Godbold's financial statement. Because of the conflicting evidence presented on these points, not only between the parties, but between the affidavits of the Bank's president, the court finds there are genuine issues of material fact as to these two elements and will need live testimony to resolve these issues. Therefore the court will deny both parties' motions for summary judgment as to the § 523(a)(2)(B) claim. The case will be set for trial, wherein the only two points at issue will be (1)whether Godbold caused his October 16, 2003 financial statement with the intent deceive and (2) whether the Bank reasonably relied on Godbold's October 16, 2003 financial statement.

§ 523(a)(2)(A)

The Bank's § 523(a)(2)(A) claim is based on Godbold's omission of the construction loan on his October 16, 2003 financial statement. In order to prove that a debt is nondischargeable pursuant to § 523(a)(2)(A), the plaintiff must prove false pretenses, false representation or fraud

-11-

*other than* a statement respecting the debtor's financial condition. 11 U.S.C. § 523(a)(2)(A) (emphasis added). Here the plaintiff is relying on Godbold's materially false financial statement. A financial statement is clearly a statement respecting the debtor's financial condition. *See Barnett Bank of Polk County v. Perez (In re Perez)*, 94 B.R. 765 (Bankr. M.D. Fla. 1988). Thus plaintiff's § 523(a)(2)(A) claim must fail as neither a statement within nor an omission from a financial statement can be a basis for an exception to discharge under the clear language of § 523(a)(2)(A). Therefore there is no genuine issue of any material fact concerning the plaintiff's complaint under § 523(a)(2)(A). Accordingly, Godbold's motion for summary judgment will be granted as to that portion of the plaintiff's complaint and the Bank's motion for summary judgment will be denied on that claim.

Therefore, it is ordered that:

1) The motion for summary judgment of Robert C. Godbold is GRANTED IN PART and DENIED IN PART;
    (a) Godbold's motion is granted as to the § 523(a)(2)(A) claim;
    (b) Godbold's motion is denied as to the § 523(a)(2)(B) claim;

2) The motion for summary judgment of the Bank of Pine Hill is DENIED;

3) The case will be set for trial on January 19, 2006 at 11:00 a.m. to determine the dischargeability of the debts owed to plaintiff under § 523(a)(2)(B).


Dated:   October 12, 2005


MARGARET A. MAHONEY
U.S. BANKRUPTCY JUDGE